

# Fourth Court of Appeals

## San Antonio, Texas

## OPINION

No. 04-22-00769-CV

Henry **RIDGEWAY** and Hugo Xavier de los Santos,
Appellants

v.

**MEDFINMANAGER, LLC** and Ernest P. Barrett,
Appellees

From the 166th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-CI-23662
Honorable Laura Salinas, Judge Presiding

Opinion by:     Adrian A. Spears II, Justice

Sitting:        Irene Rios, Justice
                Lori I. Valenzuela, Justice
                Adrian A. Spears II, Justice

Delivered and Filed: February 19, 2025

AFFIRMED AS MODIFIED IN PART; REVERSED AND RENDERED IN PART

After a jury trial, Appellants Henry Ridgeway ("Ridgeway") and Hugo Xavier de los Santos ("de los Santos") were found jointly and severally liable to Appellee MedFinManager, LLC ("MedFin"). According to the jury's verdict, Ridgeway breached his contractual obligation to MedFin and committed fraud against MedFin, while de los Santos transferred assets with actual intent to hinder, delay, or defraud MedFin in violation of the Texas Uniform Fraudulent Transfer Act ("TUFTA"). The jury further found that MedFin suffered damages in the amount of

$215,104.39. On appeal, Ridgeway and de los Santos both argue attorney immunity bars MedFin's claims against them as a matter of law. Because we hold de los Santos's affirmative defense of attorney immunity barred MedFin's TUFTA claim against him as a matter of law, we reverse the trial court's judgment in part and render a take-nothing judgment on MedFin's TUFTA claim against de los Santos. However, because Ridgeway failed to show attorney immunity barred MedFin's breach of contract claim against him as a matter of law, we affirm the judgment as to Ridgeway, modifying the judgment to account for $85,000.00 taken by MedFin from the court's registry.

## BACKGROUND

The underlying dispute between the parties involved in this appeal arose from a personal injury lawsuit in which Ridgeway and de los Santos represented Ernest P. Barrett ("Barrett"). On March 7, 2011, Barrett hired Ridgeway, his friend and attorney, to represent him with regard to a motor vehicle accident. Over three years later, Barrett also hired de los Santos to represent him.

At trial, Barrett testified that he needed a surgery and was referred to a neurosurgeon by an orthopedic surgeon. Because the operation he needed was expensive, the neurosurgeon's assistant gave him a MedFin application, which she stated would help him finance his surgery. Joel Clapick, the president of MedFin, explained at trial that "[e]ssentially, MedFin is a company that facilitates medical care on a lien," "[w]hich is a fancy way of saying that we assist medical procedures that are related to personal injury accidents." When asked to explain MedFin's "business module," Clapick testified that "[a]t its most basic level, MedFin purchases accounts receivable that are all medical related." MedFin "do[es] so at a discount" and "collect[s] the billed amount of the medical bill." Clapick explained that "essentially, MedFin is making the spread, if you will, between what [it has] been able to purchase and what [it] collect[s]."

Barrett testified he took the MedFin documents to Ridgeway's office and dropped them off with the receptionist. According to Barrett, Ridgeway never explained the documents to him, and Barrett just received a phone call from Ridgeway's office to return and sign the documents. Ridgeway testified that he had never heard of MedFin before Barrett brought the documents to his office and stated that he wanted to apply for funds to pay for his surgery. In contrast to Barrett's testimony, Ridgeway testified that he had methodically explained every Medfin document to Barrett before Barrett signed them.

On June 10, 2013, Ridgeway sent a case assessment form to MedFin on behalf of Barrett. MedFin responded to Ridgeway by sending him, via facsimile, various documents dated August 28, 2013: two separate letters, an affidavit, a memorandum, and several contracts regarding Barrett's medical providers. In the first letter addressed to Ridgeway, MedFin informed Ridgeway that it had completed its preliminary review of his client's case on behalf of the medical providers who had been asked to render their services "on a lien-basis." The letter explained that in order to complete its review, MedFin needed Barrett to fill out the accompanying "Client Affidavit." The Client Affidavit reflects that Barrett answered questions related to the accident. Barrett signed the affidavit on August 30, 2013, and it was notarized on that same date.

MedFin also sent a "Memorandum of Understanding" addressed to Ridgeway. The memorandum stated that MedFin was working with Barrett's neurosurgeon and that the surgery was estimated between $230,000.00 and $250,000.00. The memorandum stated that Barrett's neurosurgeon had been asked to render his services "on a lien-basis," which would require the neurosurgeon to assume the risk of nonpayment. The memorandum then explained MedFin's involvement with Barrett's medical care:

> Since its inception more than ten years ago, MedFin[] has grown into a national enterprise that has successfully participated with medical providers in thousands of

major cases, allowing their patients to secure needed and valuable treatment for significant accident-related injuries. Unlike other companies, MedFin[] has a strong financial foundation, streamlined operations, a dedication to open communication, and a commitment towards fair and reasonable medical billing. You will also be pleased to know that MedFin[] does not charge interest or assess any additional fees for its service.

As the premier national company in our industry and the leader in ethical business practices, we are dedicated to monitoring billed charges for consistency, accuracy and fairness as one part of our due diligence. To that end, and for your client's protection, MedFin[] urges you to always obtain a written estimate directly from the medical provider(s), prior to the performance of the medical procedure. This enables any concerns to be identified prior to the treatment and serves to eliminate any surprises or objections that you or your client may have when the provider's final bill is received.

Due to the significant financial commitment that MedFin[] makes to medical providers, a comprehensive analysis of each case is conducted, to include:
- assessment of liability issues
- confirmation of policy limits
- review of pre-existing medical conditions (if applicable)
- evaluation of the venue's impact on the value of the case
- determination that the medical experts can provide a trustworthy opinion pertaining to the causal link between injuries and the accident[.]

MedFin[]'s due diligence generally includes discussion and assessment regarding:
- your client's background (a background check may be necessary)
- your client's ability to be an honest and effective plaintiff
- your client's understanding of [his] legal obligation to pay the cost of the medical care in full
- your (and your client's) estimation of the value of the case[.]

MedFin[] only purchases lien-based accounts receivable in cases that have undergone this collaborative review, which serves to avoid any last minute surprises that might jeopardize the successful outcome of a case.

Furthermore, because MedFin[] is often the largest of all lien holders, medical or otherwise, and expends more out-of-pocket capital at an early point in time, when the risk is higher, lien reductions cannot be granted automatically. We will, however, entertain lien reduction requests in situations of extraordinary circumstance.

At the bottom of the memorandum was a place for Ridgeway to sign after the word

"UNDERSTOOD." Ridgeway signed the memorandum.

In the second letter, also dated August 28, 2013, MedFin informed Ridgeway that it had completed its review of "Barrett's case with respect to the injury related medical care that he requires" and was "pleased to report that the case meets [its] internal qualifications." This second letter reiterated MedFin's involvement:

> MedFin[] is a specialty financial services company that works alongside healthcare providers in situations where a healthcare provider is asked to render medical care to a patient who has been involved in an accident that was caused by a negligent third party. Considering that the patient does not have health insurance (or the patient's health insurance will not cover the necessary treatment) and the liable third party has not offered to pay for the patient's medical care in advance, there is no way for the medical providers to be immediately compensated for their services.
>
> In these types of situations, medical providers can opt to render their services with the security of a consensual contract/lien. While a contract/lien protects their potential future payment it does not guarantee it. Because of this, most medical providers, such as surgeons and hospitals, are cautious when asked to perform major medical services on a lien-basis. The inherent risks and characteristics of personal injury claims are often onerous, and difficult to understand. Thus, medical providers look to a company, such as MedFin[], to evaluate the merits of their incoming lien requests.
>
> Your client's medical providers are going beyond their normal obligation by agreeing to treat Mr. Barrett with the understanding that payment will not be received from him on a timely basis. Due to the uncertainty of a specific payment date from your client, coupled with the risk of nonpayment, *requests for reductions of their billed amounts will not be entertained*. Furthermore, it is important that Mr. Barrett understands that the medical bills related to the lien(s) *must be repaid in full from any award or settlement before any disbursement can be made to him*.
>
> We understand that [Barrett's neurosurgeon] is recommending a C6-7 anterior cervical decompression and fusion. We further understand that the global estimate for this medical procedure is $230,000-$250,000. Please note that this is an estimate only and actual charges can and do vary greatly.

(emphasis added). At the bottom of this second letter, after the words "I have reviewed and understand the contents of this letter," both Ridgeway and Barrett signed.

Finally, MedFin sent six separate documents, titled "Contract for Payment/Medical Lien." Each Contract for Payment/Medical Lien was addressed to one of Barrett's medical providers and

had identical language. The contract provided that Barrett authorized his attorney to withhold sums "from any settlement, judgment or verdict" to pay "the above Medical Provider or its Assigns" "such sums as maybe due and owing" "for medical and professional services rendered to [Barrett]." The contract further provided that the "right to payment evidenced by this contract/lien is irrevocable" and that Barrett understood and acknowledged he "may not rescind or terminate this contract/lien." Barrett signed and dated the contract August 30, 2013.

At the end of the contract was a separate section titled "Attorney's Consent to Contract for Payment/Medical Lien," which provided the following:

> The undersigned being attorney of record for the above patient hereby agrees to observe all the terms of the above [including without limitation, the provisions governing collection activities and litigation] and agrees to withhold all sums from any settlement, judgment or verdict as may be necessary to pay in full said Provider or its assigns. Undersigned agrees to verify the amount claimed of any bill then owed to Provider by his/her client before any disbursement is made to the client and to pay Provider or its assigns within thirty (30) days after receipt of settlement, judgment, or verdict proceeds.
>
> In the event of dispute of the amount to be paid to [P]rovider or its assigns, and such dispute is not resolved within fourteen days thereafter, the undersigned attorney shall interplead all funds in dispute with a court having jurisdiction over the parties. If the undersigned attorney fails to timely interplead all such funds, the undersigned attorney shall be responsible for all subsequent attorneys' fees and costs incurred by [P]rovider or its assigns in any subsequent efforts by [P]rovider or its assigns to collect any sums owing to [P]rovider.
>
> Undersigned attorney verifies that the above referenced patient has made the personal and irrevocable obligation to make payment in full for the medical care being rendered by Provider.
>
> Undersigned attorney agrees that requests for reduction of the Provider's billing(s) will not be submitted to the Provider or its assigns based upon the application of the "Common Fund Doctrine" or the "Make Whole Doctrine," and any such reduction requests will not be granted by the Provider or its assigns.
>
> *Undersigned agrees that it will provide written notice to Provider or its assigns should its legal obligation of Patient be terminated or cease to continue. This written notice is to be provided within ten (10) days of any such termination.*

(emphasis added). It is undisputed that both Barrett and Ridgeway signed this contract and dated it August 30, 2013.

On December 19, 2013, Barrett had his surgery. On January 16, 2014, MedFin bought the accounts receivable from Barrett's medical providers at a discount and became the assignee with respect to the above contracts.

Years later, on April 11, 2016, Barrett hired de los Santos as co-counsel in his personal-injury lawsuit. The letter signed by de los Santos, Ridgeway, and Barrett indicated that Ridgeway and de los Santos would each be responsible for half of the attorney work in the case and would each receive fifty percent of the attorneys' fees owed under their contingency fee agreements with Barrett.

In August 2017, while being represented by both Ridgeway and de los Santos, Barrett agreed at a mediation to settle his personal-injury lawsuit for $450,000.00. Ridgeway testified that after this mediation, "[s]ometime in August," he was fired by Barrett. He never had any contact with Barrett again. According to Ridgeway, he had nothing to do with Barrett signing the settlement agreement or agreeing to how the settlement funds were dispersed. Ridgeway admitted that he never informed MedFin that he had been terminated by Barrett.

In contrast, Barrett testified that he never fired Ridgeway with respect to his personal injury case. De los Santos disputed this testimony, stating that if Barrett testified he never fired Ridgeway, he was incorrect. According to de los Santos, Barrett told him about firing Ridgeway. Further, de los Santos testified that shortly after Barrett's case was settled, Ridgeway told him about being fired by Barrett.

On September 6, 2017, MedFin sent an email to Ridgeway inquiring about the status of Barrett's personal injury lawsuit. The email included a total balance of the medical bills and reminded Ridgeway that MedFin would not accept any reduction proposals.

De los Santos testified he received Barrett's settlement check, which was dated September 1, 2017, and deposited it into his escrow IOLTA account on September 22, 2017. That same day, he immediately wrote a $5,000.00 check to Ridgeway for expenses Ridgeway had paid in Barrett's case.

On September 21, 2017, Barrett met with de los Santos and signed the Settlement and Release Agreement. On November 1, 2017, de los Santos presented Barrett with a Closing Letter, stating that pursuant to Barrett's instructions, he accepted the settlement offer of $450,000.00. The letter informed Barrett that a third of the settlement were attorneys' fees pursuant to the contingency fee contract. With regard to Barrett's medical providers, the letter stated that "the outstanding balance of [Barrett's] health care expenses and other loans or accounts associated with this matter amounted to well over $358,696.51." The letter listed the amounts that de los Santos would be paying to the medical providers out of the settlement, which was less than the amounts billed. The letter stated that "per [Barrett's] instructions," de los Santos would be paying "only the above set forth amounts to each of [Barrett's] respective health care providers." The letter reiterated that Barrett would "alone be fully and completely responsible for payment of any and all of the balances due to [his] health care providers and/or other businesses or entities" and that Barrett "shall indemnify [de los Santos] and hold [de los Santos] harmless for any liability that may be claimed, if any, or asserted by any of your health care providers or any other entity or business." At the end of the letter, Barrett signed that he "read, understood, agreed and approved."

Also on November 1, 2017, de los Santos sent MedFin separate letters with respect to each of Barrett's medical providers and enclosed checks for less than the amount charged. In these letters, de los Santos stated that Barrett disagreed with the amount charged being "fair or reasonable" and disputed that the amount charged for services was "reasonable," "customary," "necessary," or in line with similar services being charged in Bexar County. The letters ended with de los Santos explaining that the enclosed checks were being delivered "on the condition that if [MedFin] accept[ed] it, it shall pay the entire balance [Medfin] ha[d] claimed and/or billed [Barrett]." "Thus, upon [MedFin's] acceptance or negotiation of the enclosed check, the balance is now paid in full."

In response, MedFin sent a letter back to de los Santos, stating that it did "not accept the greatly reduced amounts that Barrett [was] attempting to pay," and returned the checks. On December 19, 2017, MedFin sued Barrett,[1] Ridgeway, and de los Santos based on the contracts described above. Ridgeway and de los Santos filed answers that asserted the affirmative defense of attorney immunity for acts within the scope of their legal representation of Barrett. On December 20, 2018, de los Santos filed a cross-claim against Barrett for contractual indemnity. On May 20, 2019, de los Santos filed various counter-claims against MedFin and Joel Clapick. On November 4, 2021, the trial court severed de los Santos's counter-claims from the underlying lawsuit. The trial court's order further provided that the "issue of attorneys' fees will be bifurcated and the issue of fees for both [the underlying cause of action] and the severed cause will be submitted to the court after the conclusion of both cases."

---

[1] At trial, MedFin nonsuited its claims against Barrett.

At the conclusion of MedFin's case, de los Santos and Ridgeway moved for directed verdict on the basis of attorney immunity, which was denied by the trial court. After being charged by the court, the jury found the following:

(1) Ridgeway failed to comply with his obligations under the Contract/Liens, and MedFin's damages relating to that breach were $215,104.39.

(2) Ridgeway committed fraud against MedFin, and MedFin's damages relating to that fraud were $215,104.39.

(3) Ridgeway was not part of a conspiracy to commit fraud with de los Santos and did not intentionally interfere with the Contract/Liens between Barrett and MedFin.

(4) Ridgeway did not transfer any assets with actual intent to hinder, delay, or defraud any creditor in violation of TUFTA.

(5) De los Santos was not part of a conspiracy to commit fraud with Ridgeway that damaged MedFin.

(6) De los Santos did not intentionally interfere with the Contract/Liens between Barrett and MedFin.

(7) De los Santos did transfer assets with actual intent to hinder, delay, or defraud a creditor in violation of TUFTA., and the amount of damages related to that claim is $215,104.39.

(8) Barrett failed to comply with his contract with de los Santos.

On August 19, 2022, the trial court signed the judgment, finding that Ridgeway and de los Santos were jointly and severally liable to MedFin for the sum of $215,104.39. Both de los Santos and Ridgeway filed motions for judgment notwithstanding the verdict. This appeal followed.

## COURT'S REGISTRY

On April 6, 2018, the trial court noted that de los Santos had "retained partial funds in his trust account in the amount of $85,000.00 related to the money claimed by MedFin." The trial court ordered de los Santos to place that $85,000.00 in the court's registry, which he did. The trial court then released the $85,000.00 to MedFin. The trial court's judgment, however, made no

allowance for the $85,000.00 already released to MedFin. On appeal, de los Santos argues that the trial court erred by refusing to remit or reduce the judgment by the $85,000.00 taken by MedFin from the court's registry. In response, MedFin concedes that the judgment should be modified "by giving credit for $85,000.00 distributed by the court." Thus, we agree that the trial court's judgment must be modified to reflect the $85,000.00 that was distributed to MedFin from the court's registry.

### ATTORNEY IMMUNITY AFFIRMATIVE DEFENSE

Both de los Santos and Ridgeway argue that attorney immunity bars MedFin's claims against them as a matter of law. Both de los Santos and Ridgeway raised attorney immunity as an affirmative defense in their respective answers to MedFin's lawsuit. At trial, they both moved for directed verdict on their affirmative defenses of attorney immunity, which were denied by the trial court. After the verdict, they both filed motions for judgment notwithstanding the verdict on the basis of attorney immunity, which were also denied by the trial court. On appeal, they both argue the trial court erred in failing to grant their respective motions for judgment notwithstanding the verdict.

### A. Standard of Review

We review a denial of a motion for judgment notwithstanding the verdict for legal sufficiency. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). "Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 841 (Tex. 2018) (quoting *Gunn v. McCoy*, 554

S.W.3d 645, 658 (Tex. 2018)). "We must consider all of the evidence 'in the light most favorable to the party in whose favor the verdict has been rendered,' and 'every reasonable inference deducible from the evidence is to be indulged in that party's favor.'" *Id*. at 841-42 (quoting *Gunn*, 554 S.W.3d at 658). "If the evidence offered to prove a vital fact's existence is 'so weak as to do no more than create a mere surmise or suspicion,' the record contains less than a scintilla." *Id*. at 842 (quoting *Gunn*, 554 S.W.3d at 658).

### B. Attorney Immunity Doctrine

"Texas common law is well settled that an attorney does not owe a professional duty of care to third parties who are damaged by the attorney's negligent representation of a client." *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). The attorney immunity doctrine in Texas provides an attorney with an affirmative defense that protects them "from liability to non-clients, stemming from the broad declaration over a century ago that 'attorneys are authorized to practice their profession, to advise their clients and interpose any defense or supposed defense, without making themselves liable for damages.'" *Id*. (quoting *Kruegel v. Murphy*, 126 S.W. 343, 345 (Tex. Civ. App. 1910, writ ref'd)). "This attorney-immunity defense is intended to ensure 'loyal, faithful, and aggressive representation by attorneys employed as advocates.'" *Id*. (quoting *Mitchell v. Chapman*, 10 S.W.3d 810, 812 (Tex. App.—Dallas 2000, pet. denied)); *see also Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 79 (Tex. 2021) ("We have recognized attorney immunity because attorneys are duty-bound to competently, diligently, and zealously represent their clients' interests while avoiding any conflicting obligations or duties to themselves or others."). Accordingly, "as a general rule, attorneys are immune from civil liability to non-clients 'for actions taken in connection with representing a client in litigation.'" *Cantey Hanger*, 467 S.W.3d at 481 (quoting *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st

Dist.] 2005, pet. denied)). "Even conduct that is 'wrongful in the context of the underlying suit' is not actionable if it is 'part of the discharge of the lawyer's duties in representing his or her client.'" *Id*. (quoting *Toles v. Toles*, 113 S.W.3d 899, 910-11 (Tex. App.—Dallas 2003, no pet.)).

The Texas Supreme Court has explained that "[m]erely labeling an attorney's conduct 'fraudulent' does not and should not remove it from the scope of client representation or render it 'foreign to the duties of an attorney.'" *Id*. at 483 (quoting *Alpert*, 178 S.W.3d at 406). Instead, "the focus in evaluating attorney liability to a non-client is on the kind—not the nature—of the attorney's conduct." *Id*. (citations omitted). Thus, "[f]raud is not an exception to attorney immunity; rather, the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation." *Id*. at 484. "An attorney who pleads the affirmative defense of attorney immunity has the burden to prove that his alleged wrongful conduct, regardless of whether it is alleged fraudulent, is part of the discharge of his duties to his client." *Id*.

The attorney immunity doctrine has two elements: (1) the existence of an attorney-client relationship at the time of the attorney's complained of conduct; and (2) the type of conduct at issue was within the scope of representation. *Youngkin v. Hines*, 546 S.W.3d 675, 683 (Tex. 2018). The first element is factual in nature, and the second is legal. *Taylor v. Tolbert*, 644 S.W.3d 637, 645 (Tex. 2022); *Youngkin*, 546 S.W.3d at 683; *Cantey Hanger*, 467 S.W.3d at 481-83. "'The only facts required to support an attorney-immunity defense are the type of conduct at issue and the existence of an attorney-client relationship at the time' the attorney engaged in the conduct." *Taylor*, 644 S.W.3d at 645 (quoting *Youngkin*, 546 S.W.3d at 683). A court then decides "the legal question of whether said conduct was within the scope of representation." *Id*. (quoting *Youngkin*, 546 S.W.3d at 683). Under our standard of review, we thus consider all the evidence in the light

favorable to the jury's verdict and determine whether the evidence established the attorney immunity affirmative defense as a matter of law. *See JBS Carriers*, 564 S.W.3d at 841-42.[2]

### C. De Los Santos

The undisputed evidence at trial showed that Barrett and de los Santos were in an attorney-client relationship at the time de los Santos disbursed the settlement funds from his attorney IOLTA escrow account. Thus, the only issue remaining is a *legal* one—whether de los Santos's act of disbursing the settlement funds was within the scope of his representation of Barrett. *See Youngkin*, 546 S.W.3d at 683.

The supreme court has explained that an attorney acts within the scope of his representation when he engages in "'the kind of conduct' attorneys undertake while discharging their professional duties to a client." *Taylor*, 644 S.W.3d at 646 (quoting *Haynes & Boone*, 631 S.W.3d at 67). "Conduct is not the kind of conduct attorney immunity protects 'simply because attorneys often engage in that activity' or because an attorney performed the activity on a client's behalf." *Id*. "Immunity attaches only if the attorney is discharging 'lawyerly' duties to his or her client." *Id*. "A corollary to this principle is that attorneys will not be entitled to civil immunity for conduct that is 'entirely foreign to the duties of an attorney.'" *Id*. "'Foreign to the duties' does not mean something a good attorney should not do; it means that the attorney is *acting outside his or her capacity and function as an attorney*." *Id*. (emphasis added). "For that reason, whether counsel

---

[2]In its briefs, MedFin argues that de los Santos has failed to bring a complete record on appeal because the appellate record does not include "related rulings and motions and evidence provided thereto," which "support the trial court's denial of the summary judgment motions [brought by de los Santos] regarding attorney immunity." However, when a case has been tried on the merits, a "trial court's denial of a motion for summary judgment is not reviewable on appeal." *Diaz v. Covarrubias*, No. 04-07-00853-CV, 2008 WL 2715125, at *3 (Tex. App.—San Antonio July 9, 2008, no pet.) (citing *Orozco v. Orozco*, 917 S.W.2d 70, 72 (Tex. App.—San Antonio 1996, writ denied)). Further, the case relied on by MedFin, *Enterprise Leasing Co. v. Barrios*, 156 S.W.3d 547 (Tex. 2004), is inapplicable to the facts in this case, as the issue in *Enterprise Leasing* involved an order *granting summary judgment*, which is reviewable on appeal. Thus, the trial court's denial of summary judgment on the issue of attorney immunity is immaterial to this appeal, and de los Santos was not required to include those pleadings in the appellate record.

may claim the privilege *turns on the task that was being performed*, not whether the challenged conduct was meritorious." *Id*. at 646-47 (emphasis added).

According to MedFin, the evidence shows that de los Santos made a fraudulent transfer and was "act[ing] in his personal capacity" when he did so. However, as noted, we must "look beyond [the] characterizations of activity as fraudulent and conspiratorial," and instead focus on the task that the attorney was doing at the time of the alleged wrongful conduct. *Youngkin*, 546 S.W.3d at 682. "This is not to say that an attorney could not be held liable to his own client for misconduct" "or be reprimanded for ethics violations." *Id*. "But to be held liable to the opposing party is *a wholly different matter*." *Id*. (emphasis added). Here, the evidence in the light most favorable to the jury's verdict shows that de los Santos distributed settlement funds from his IOLTA escrow account to Barrett, Ridgeway, and himself, without first ensuring that MedFin's contract/lien was paid in full by Barrett. MedFin argues that in distributing the settlement funds, de los Santos was acting in his personal capacity. However, disbursing settlement funds to or on behalf of a client is the type of conduct within the scope of representation. *See U.S. Bank Nat'l Ass'n v. Sheena*, 479 S.W.3d 475, 480 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding that attorney immunity doctrine applied even though attorney was alleged to have fraudulently disbursed settlement funds obtained from an insurance company without first "considering a third party's alleged interest in the funds"). That de los Santos distributed part of the settlement funds to himself as his attorney's fee in the case does not equate to him acting in a personal capacity. *See id*.

Further, the evidence in this case, even in the light most favorable to the jury's verdict, does not establish a recognized exception to the applicability of the attorney immunity doctrine. Such recognized exceptions include "participation in a fraudulent business scheme with a client,

knowingly helping a client with a fraudulent transfer to avoid paying a judgment, theft of goods or services on a client's behalf, and assaulting opposing counsel during trial." *Youngkin*, 546 S.W.3d at 682-83. First, MedFin did not allege in this case, nor did the evidence show, that de los Santos and Barrett engaged in a fraudulent business venture. Although MedFin makes many allegations that de los Santos, on his own and with Ridgeway, engaged in fraudulent acts, including advising Barrett to file bankruptcy after being sued by MedFin, the evidence in the light most favorable to the verdict merely shows de los Santos's acts involve the "kind of conduct attorneys undertake while discharging their professional duties to a client." *Taylor*, 644 S.W.3d at 646. That MedFin argues those acts were fraudulent does not take them outside attorney immunity. *See Cantey Hanger*, 467 S.W.3d at 483 ("Fraud is not an exception to attorney immunity; rather, the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation."). Second, while MedFin argues de los Santos fraudulently transferred funds, it is undisputed that there was no judgment to avoid at the time he distributed the settlement funds. Third, there is no allegation or evidence of assault in this case.

Finally, we consider whether TUFTA abrogates the attorney immunity doctrine. In *Taylor v. Tolbert*, 644 S.W.3d 637, 649 (Tex. 2022), the supreme court considered whether the Texas wiretap statute abrogates the common law attorney immunity defense. The court explained that although "[c]ommon-law defenses may be abrogated by statute," "under Texas law, statutes purporting to abrogate common-law principles must do so either expressly or by necessary implication." *Id*. The court explained that "[a]s a general proposition," Texas follows an "'opt-out' approach that incorporates common-law principles absent the Legislature's clear repudiation." *Id*. at 650. "Accordingly, the Legislature need not expressly adopt the attorney-immunity defense for

it to apply to claims under the wiretap statute." *Id*. According to the court, "courts presume that the Legislature acted with complete knowledge of existing law and with reference to it." *Id*. The court emphasized that the Texas wiretap statute "does not expressly repudiate the common law or the attorney-immunity defense" *Id*. at 649. In reviewing the language of the statute, the court noted that "the statute includes no provision that is inherently adverse to immunizing attorneys from civil liability for their legal work on behalf of their clients." *Id*. at 652. Thus, "[b]ecause nothing in the Texas wiretap statute demonstrates clear legislative intent to preclude attorney immunity, the common-law defense applies." *Id*.

Similarly, here, TUFTA does not expressly repudiate the common law or the attorney immunity defense. *See id*. TUFTA includes no provision that "is inherently adverse to immunizing attorneys from civil liability for their legal work on behalf of their clients." *See id*. We therefore conclude that TUFTA does not abrogate the common law attorney immunity defense.

In considering all the evidence in the light most favorable to the jury's verdict, we conclude that de los Santos established his defense of attorney immunity as a matter of law. *See JBS Carriers*, 564 S.W.3d at 841. Thus, the trial court erred in failing to grant his motion for JNOV. We reverse that portion of the judgment that holds de los Santos liable to MedFin and render judgment that MedFin take nothing against de los Santos.

*D. Ridgeway*

Like de los Santos, Ridgeway argues that the evidence at trial established his affirmative defense of attorney immunity as a matter of law. Of course, the difference between de los Santos and Ridgeway with respect to the applicability of attorney immunity is that Ridgeway signed the "Attorney's Consent to Contract for Payment/Medical Lien" for each of Barrett's medical

providers. MedFin argues that Ridgeway's act of signing the above contracts places him outside of any attorney immunity defense.

"[I]n order to hold an individual liable on a claim for breach of contract, there must generally be privity between the party damaged and the party sought to be held liable." *1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 370 (Tex. App.—El Paso 2022, no pet.). "Privity of contract is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff." *Id*. Attorney immunity does not apply when an attorney is in contractual privity with a party. *See Jurek v. Kivell*, No. 01-10-00040-CV, 2011 WL 1587375, at *5 (Tex. App.—Houston [1st Dist.] Apr. 21, 2011, no pet.) (noting that the attorney immunity doctrine "exists because the third party has not retained the attorney, the attorney's services were not rendered to the third party, *no privity of contract exists* between the third party and the attorney, and the attorney's duties are owed only to the client") (emphasis added); *White v. Bayless*, 32 S.W.3d 271, 275 (Tex. App.—San Antonio 2000, pet. denied) (same); *see also Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (explaining that because "[a]t common law, the rule of privity limits an attorney's liability to those in privity with the attorney," "[a]n attorney in Texas . . . is not liable to non-client third parties for legal malpractice").

Accordingly, attorneys have been found to be in contractual privity with medical providers in cases involving letters of protection ("LOP"). For example, in *Hays & Martin, LLP v. Ubinas-Brache*, 192 S.W.3d 631, 633 (Tex. App.—Dallas Apr. 4, 2006, pet. denied), the medical provider sued the patient's law firm for breach of contract for failing to comply with its promise in a LOP to "protect" "all medical bills related to [the patient's] accident at the time of settlement" of the patient's claims. *Id*. The jury found the law firm was liable for breach of contract to the patient's

medical provider. *Id*. On appeal, the law firm argued that the LOP was not an enforceable contract because there was no evidence of offer and acceptance. *Id*. at 635. The appellate court disagreed, reasoning that the jury heard evidence that the LOP was solicited and thus the jury "could have reasonably determined the solicitation of the letter of protection in exchange for [the medical provider]'s cooperation with [the patient]'s law suit was an offer, and when [the law firm] sent [the medical provider] the letter of protection in response to [the medical provider]'s request, [the law firm] clearly communicated its acceptance of [the medical provider]'s offer." *Id*. at 635-36. Similarly, in *Law Offices of Adrian Crane & Assocs., P.C. v. Petty*, No. 12-03-00444-CV, 2005 WL 1000621, at *1 (Tex. App.—Tyler Apr. 29, 2005, no pet.), a law firm, while representing a client in personal injury matter, "entered into a letter of protection agreement" with the client's medical provider concerning the provider's treatment of the client. When the medical provider was not paid for his treatment of the client, he sued the law firm for breach of contract. *Id*. The appellate court determined that the summary judgment evidence conclusively showed "that there existed a contract in the form of a letter of protection agreement between [the law firm] and [the medical provider]." *Id*. at *3.

Conversely, at least one court of appeals has held that attorney immunity barred an ex-husband's breach of contract action against his ex-wife's attorney in the context of a settlement agreement. In *Sagredo v. Ball*, 689 S.W.3d 407, 410 (Tex. App.—Corpus Christi-Edinburg 2024, no pet.), the ex-husband had previously been sued by his ex-wife for abuse of process, assault, conspiracy, and malicious prosecution. The ex-husband and the ex-wife resolved their dispute by entering into a settlement agreement, which stated that the agreement was between the wife, husband, and "and all attorneys." *Id*. at 414. The agreement provided that the ex-wife would "not seek to utilize documents, information or testimony in any form which arose out of an altercation

and arrest in Las Vegas . . . between the parties in any forum or litigation between the parties in the future . . . ." *Id*. at 410. The ex-wife's attorney later filed a motion in a separate child custody proceeding. *Id*. The ex-husband then sued the ex-wife's attorney for breach of contract. *Id*. The ex-husband argued that the attorney-immunity defense did not apply because he was in privity of contract with the ex-wife's attorney. *Id*. at 414. The appellate court disagreed, noting that the ex-wife's attorney in filing the motion in the child custody case was providing "services which 'involv[e] the unique office, professional, skill, training, and authority of an attorney' in order to 'fulfill [his] duties in representing' [the ex-wife] as her attorney in an adversarial context." *Id*. (quoting *Haynes & Boone*, 631 S.W.3d at 78). The court explained "[f]iling a motion on behalf of a client in litigation is quintessentially the 'kind' of conduct undertaken by an attorney in representing his client." *Id*. Thus, the court held attorney immunity applied. *Id*. Further, the court noted that "although the agreement recited that 'all attorneys' of [the ex-wife and ex-husband] were parties to the agreement," the section at issue "explicitly applied only to [the ex-wife]." *Id*. at 414 n.7. "Moreover, although [the ex-wife's attorney] signed the agreement, his signature was preceded by the statement: 'AGREED ONLY AS TO FORM AND CONTENT.'" *Id*.

In the present case, Ridgeway signed the "Attorney's Consent to Contract for Payment/Medical Lien" for each of Barrett's medical providers. In those contracts, Ridgeway agreed to provide written notice to the respective medical providers "or its assigns" should his "legal obligation of [Barrett] be terminated or cease to continue." The contract provided that "written notice [was] to be provided within ten (10) days of any such termination." Unlike in *Sagredo*, this provision explicitly applied to Ridgeway and required him to independently notify MedFin if he was terminated by Barrett. Thus, by signing the "Attorney's Consent To Contract for Payment/Medical Lien," Ridgeway undertook an independent contractual duty toward MedFin,

and this act of notifying MedFin of his termination is outside the scope of his representation of Barrett. Thus, we conclude that *Sagredo* is distinguishable. In reviewing the evidence in the light most favorable to the jury's verdict, we hold that Ridgeway failed to show as a matter of law that attorney immunity barred MedFin's breach of contract claim.

## MEDFIN'S BREACH OF CONTRACT CLAIM AGAINST RIDGEWAY

In Question No. 1 of the jury charge, the jury found that Ridgeway "fail[ed] to comply with his obligations under the Contract/Lien." Question No. 2 asked the jury "[w]hat sum of money, if any, if paid now in cash, would fairly and reasonably compensate MedFin for its damages, if any, that resulted from Ridgeway's failure to comply with the Contract/Lien?" The jury was instructed that "remedial damages" were the "reasonable and necessary money that Ridgeway would need to pay MedFin to put it in the same position that it would have been if Ridgeway had not breached the Contract/Lien." The jury determined that "remedial damages sustained in the past" by MedFin was "$215,104.39." On appeal, Ridgeway argues the trial court erred in failing to disregard the jury's answer to Question No. 2 because "there is no evidence of a causal connection between Ridgeway's breach of the Contracts for Payment/Medical Lien and the damages found by the jury."

"When a party attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate on appeal that no evidence supports the adverse finding." *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). "We will sustain a legal sufficiency challenge if 'the evidence offered to prove a vital fact is no more than a scintilla.'" *Id*. (quoting *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009)). "In conducting our review, 'we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless

reasonable jurors could not have done so.'" *Id*. (quoting *Akin*, 299 S.W.3d at 115). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id*. (quoting *City of Keller*, 168 S.W.3d at 827).

Ridgeway concedes that the undisputed evidence in this appeal shows that he "failed to interplead the settlement funds or give notice to MedFin that Barrett terminated his representation." According to Ridgeway, there is no evidence that his breach caused the damages suffered by MedFin. *See Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 354-55 (Tex. App.—San Antonio 1998, pet. denied) (explaining that to prove an action for breach of contract, a plaintiff must establish the defendant's breach caused the plaintiff's injury); *see also Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981) ("In an action for breach of contract, actual damages may be recovered when loss is the natural, probable, and foreseeable consequence of the defendant's conduct.").

In reviewing the evidence under our standard of review, we note that there was evidence at trial of the following facts: (1) Barrett fired Ridgeway in August 2017; (2) the settlement check relating to Barret's personal-injury lawsuit was dated September 1, 2017; (3) Barrett reviewed the settlement agreement with de los Santos on September 21, 2017; and (4) on November 1, 2017, de los Santos distributed funds from Barrett's settlement to various creditors. From this evidence, the jury could have reasonably inferred that had Ridgeway notified MedFin of his termination within ten days as required by the contract, MedFin would have had time to act to protect its interests, which was the point of the contract's notification requirement. *See Signature Indus. Serv., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022) (noting that "[d]amages for breach of contract

may include both direct and consequential damages"). We therefore hold there is legally sufficient evidence to support the element of causation.[3]

### DE LOS SANTOS'S BREACH OF CONTRACT CLAIM AGAINST BARRETT

In his live pleading, de los Santos pled a cross-claim against Barrett for breach of contract. Specifically, de los Santos pled breach of two separate contracts. First, de los Santos alleged that Barrett "engaged [him] to perform certain legal services in the defense of Barrett in the case at bar" and that "Barrett has failed and refused to pay for same." Second, with respect to Barrett's personal-injury lawsuit, de los Santos alleged that Barrett agreed to indemnify and hold de los Santos harmless "for any liability that may be claimed, if any, or asserted by any of [Barrett's] health care providers or any other entity or business." At trial, the jury found that Barrett had breached his agreement with de los Santos. In its judgment, the trial court noted the jury had "found that . . . Barrett failed to comply with his contract with Hugo de los Santos." The trial court then explained that "there was no damages question submitted by Hugo de los Santos as to such finding and there was no finding of damages." Further, the trial court stated that "[t]here was no agreement of [the] parties nor order severing such matter to a separate cause." Thus, the trial court ordered "that Defendant Hugo de los Santos take nothing related to said finding."

On appeal, de los Santos argues the trial court erred in entering a take-nothing judgment on his claim against Barrett. According to de los Santos, the "attorney's fees issues were bifurcated and ordered to be submitted to the trial court after the conclusion of both this case and the severed case." De los Santos argues that "[i]t was not necessary to request a jury issue on damages at this stage of the case, because the issue of attorney's fees was bifurcated and ordered submitted to the trial court and not the jury."

---

[3]Having held that there is sufficient evidence to sustain the trial court's judgment on MedFin's breach of contract claim against Ridgeway, we need not address Ridgeway's remaining appellate issues.

We first note that de los Santos's breach of indemnity agreement claim against Barrett is now moot. As explained previously, de los Santos's affirmative defense of attorney immunity bars all of MedFin's claims against him. Thus, there is no judgment for Barrett to indemnify. The only issue remaining is whether the trial court erred in rendering a take-nothing judgment on de los Santos's breach of contract against Barrett for legal services rendered "in the defense of Barrett in the case at bar."

The trial court's order of November 4, 2021 severed de los Santos's claims against MedFin and Joel Clapick into a new cause of action. The order also stated that "[t]he issue of attorneys' fees [would] be bifurcated[,] and the issue of fees for both [this cause] and the severed cause of action [would] be submitted to the [trial court] after the conclusion of both cases." De los Santos relies on this language for the proposition that he did not need to submit his damages question for his breach of contract claim against Barrett. We disagree. De los Santos brought a breach of contract claim against Barrett, and his damages, if proven, were the unpaid legal fees owed. These damages are not "attorneys' fees" as stated in the trial court's order. With respect to de los Santos's breach of contract claim, the attorneys' fees referred to in the trial court's order would have been the attorneys' fees de los Santos incurred by hiring his own attorney in the prosecution of his breach of contract claim. We conclude, as did the trial court, that "the issue of attorneys' fees" being bifurcated referred to the trial court later determining the amount of reasonable and necessary attorneys' fees the prevailing parties should recover for successfully prosecuting and/or defending their claims. *See Greater Houston Radiation Oncology, P.A. v. Sadler Clinic Assoc.*, 384 S.W.3d 875, 895 (Tex. App.—Beaumont 2012, pet. denied) (explaining that "[a]ttorneys' fees may only be awarded if authorized by statute or by a contract between the parties" and refers to when a party engages an attorney to enforce its right and prevails on that claim). We reject de los Santos's

interpretation that the trial court's order bifurcating "the issue of attorneys' fees" meant he was not required to submit his damages question to the jury for his breach of contract claim against Barrett.

Further, because the record reflects that de los Santos did not submit a damages question on his breach of contract claim, did not object to the lack of such a question in the jury charge, and did not otherwise inform the trial court of any objections, he has failed to preserve any appellate issue relating to the jury charge. *See Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 830-31 (Tex. 2012); *Greater Houston Radiation*, 384 S.W.3d at 894. We therefore find no error by the trial court in entering a take-nothing judgment on de los Santos's breach of contract claim against Barrett.

## CONCLUSION

Because we hold the evidence established de los Santos's affirmative defense of attorney immunity as a matter of law, we reverse that portion of the judgment that holds de los Santos liable to MedFin and render judgment that MedFin take nothing against de los Santos. Because we hold Ridgeway did not establish his affirmative defense of attorney immunity as a matter of law and because we have held there is sufficient evidence to support MedFin's breach of contract claim against Ridgeway, we affirm the trial court's finding that Ridgeway is liable to MedFin. However, in order to account for the $85,000.00 already received by MedFin from the court's registry, we modify the judgment to award MedFin the sum of $130,104.39, along with prejudgment interest on such sum, running from the date of filing of the suit through the date the final judgment was signed, and post-judgment interest on such sum.

Adrian A. Spears II, Justice